STATE OF CONNECTICUT *v.* DAVID WRIGHT
(AC 18649)

Lavery, Landau and Spear, Js.[1]

---

[1] The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued October 28, 1999—officially released June 6, 2000

*Kirstin B. Coffin*, for the appellant (defendant).

*John A. East III*, assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Robin Lipsky*, assistant state's attorney, for the appellee (state).

*Opinion*

SPEAR, J. The defendant, David Wright, appeals from the judgment of the trial court, rendered after a jury trial, of possession of a narcotic substance with the intent to sell in violation of General Statutes § 21a-278 (a),[2] possession of a narcotic substance with intent to

---

[2] General Statutes § 21a-278 (a) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person one or more preparations, compounds, mixtures or substances containing an aggregate weight of one ounce or more of heroin, methadone or cocaine or an aggregate weight of one-half gram or more of cocaine in a free-base form or a substance containing five milligrams or more of lysergic acid diethylamide, except as authorized in this chapter, and who is not, at the time of such action, a drug-dependent person, shall be imprisoned for a minimum term of not less than five years nor more than twenty years; and, a maximum term of life imprisonment. The execution of the mandatory minimum sentence imposed by the provisions of this subsection shall not be suspended except the court

sell in violation of General Statutes § 21a-277 (a)[3] and possession of a narcotic substance with the intent to sell within 1500 feet of a school in violation of General Statutes § 21a-278a (b).[4] The defendant claims that the court improperly (1) denied his motion to suppress

may suspend the execution of such mandatory minimum sentence if at the time of the commission of the offense (1) such person was under the age of eighteen years or, (2) such person's mental capacity was significantly impaired but not so impaired as to constitute a defense to prosecution."

[3] General Statutes § 21a-277 (a) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any controlled substance which is a hallucinogenic substance other than marijuana, or a narcotic substance, except as authorized in this chapter, for a first offense, shall be imprisoned not more than fifteen years and may be fined not more than fifty thousand dollars or be both fined and imprisoned; and for a second offense shall be imprisoned not more than thirty years and may be fined not more than one hundred thousand dollars, or be both fined and imprisoned; and for each subsequent offense, shall be imprisoned not more than thirty years and may be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned."

[4] General Statutes § 21a-278a (b) provides: "Any person who violates section 21a-277 or 21a-278 by manufacturing, distributing, selling, prescribing, dispensing, compounding, transporting with the intent to sell or dispense, possessing with the intent to sell or dispense, offering, giving or administering to another person any controlled substance in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school, a public housing project or a licensed child day care center, as defined in section 19a-77, that is identified as a child day care center by a sign posted in a conspicuous place shall be imprisoned for a term of three years, which shall not be suspended and shall be in addition and consecutive to any term of imprisonment imposed for violation of section 21a-277 or 21a-278. To constitute a violation of this subsection, an act of transporting or possessing a controlled substance shall be with intent to sell or dispense in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school, a public housing project or a licensed child day care center, as defined in section 19a-77, that is identified as a child day care center by a sign posted in a conspicuous place. For the purposes of this subsection, 'public housing project' means dwelling accommodations operated as a state or federally subsidized multifamily housing project by a housing authority, nonprofit corporation or municipal developer, as defined in section 8-39, pursuant to chapter 128 or by the Connecticut Housing Authority pursuant to chapter 129."

statements that he allegedly made during the arrest, (2) denied his motion to suppress tangible evidence, (3) overruled his objection to a map offered into evidence by the state, (4) denied his motion for judgment of acquittal and (5) denied his motion in limine seeking to preclude the prosecution from impeaching him by introducing his prior felony record. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On July 28, 1996, Officers William Fox and Henry Racki of the Waterbury police department were patrolling Walnut Street and the surrounding area. At approximately 10:30 p.m., the officers drove onto Walnut Street and immediately smelled the odor of burning marijuana through the open window of their police cruiser. They saw four to five young males standing on the sidewalk near the homes at 19 through 23 Walnut Street. While driving past the group, Fox saw one of the young men smoking a cigarette-like object. The officers decided to circle back to Walnut Street to further investigate the group. When they returned, the young men were standing in the same place, and both officers noticed the same strong odor of marijuana. Fox drove past the group for the second time and quickly turned into the driveway of 23 Walnut Street.

The officers got out of the cruiser and walked toward the group, which was about fifteen feet from them. The men became visibly tense and stepped back from one another as the officers approached. No one in the group immediately attempted to flee. The defendant, however, turned and began to walk in the direction of 19 Walnut Street. Fox, who was carrying a flashlight, walked past the group of young men and followed the defendant. Racki maintained a distance of approximately ten feet between himself and Fox at all times.

When he was approximately ten feet from the defendant, Fox loudly commanded, "Stop! Police!" The defen-

dant ignored Fox and continued walking toward 19 Walnut Street. With the aid of his flashlight, Fox was able to see a plastic bag in the defendant's right hand. Fox increased his pace and closed the distance between him and the defendant to approximately six feet. The defendant then entered the driveway of 19 Walnut Street and walked directly toward a garbage can that was approximately fifteen feet from the end of the driveway and near the front of the house. Fox, who was still following the defendant closely, was able to see that the defendant still possessed the bag that Fox had seen earlier. When the defendant reached the garbage can, Fox saw him dip his right hand into the can, then pull it out and spin around to display his empty hands. The defendant then addressed Fox and Racki, stating, "What's up?" or, "What's going on?"

Fox approached the garbage can and retrieved a clear plastic bag that was in plain view on top of the refuse. The bag contained twenty-six smaller ziplocked bags, each of which contained freebase cocaine, also known as crack.[5]

After Fox confiscated the drugs, he placed the defendant under arrest, charging him with possession of cocaine with intent to sell. The defendant stated that the bag was not his and that the officers did not have the right to enter his property[6] without a search warrant. The officers searched the defendant and found $1130. While the officers were taking the defendant to the police car, the defendant asked Fox not to arrest him in connection with the drugs and said that he would make it worth his while.[7]

---

[5] Richard Pinder, a physician, testified for the prosecution as an expert witness in the field of toxicology. Pinder testified that the material found in the ziplock bags totaled 14.82 grams and was determined to be freebase cocaine, also known as crack.

[6] The parties stipulated that the defendant resided at 19 Walnut Street.

[7] Fox testified that he did not charge the defendant with bribery because he did not take him seriously. He surmised that the defendant felt that he was in trouble and probably would say anything.

The jury returned verdicts of guilty on all three counts of the information. This appeal followed.

I

The defendant first claims that the court improperly denied his motion to suppress statements that he allegedly made during and after his arrest. The defendant, who was not read his *Miranda*[8] rights at the time of his arrest, claims that the statements resulted from a custodial interrogation in violation of *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). We do not agree.

"Our Supreme Court has consistently held that 'two conditions must exist before a criminal suspect is entitled to *Miranda* warnings: (1) the defendant must be in the custody of law enforcement officials; and (2) the defendant must be subjected to interrogation. *State* v. *Burak*, 201 Conn. 517, 531, 518 A.2d 639 (1986); *State* v. *Doehrer*, 200 Conn. 642, 646, 513 A.2d 58 (1986); *State* v. *Brown*, 199 Conn. 47, 51, 505 A.2d 1225 (1986).' *State* v. *Copeland*, 205 Conn. 201, 206, 530 A.2d 603 (1987)." *State* v. *Jackson*, 28 Conn. App. 721, 725, 613 A.2d 846, cert. denied, 224 Conn. 904, 615 A.2d 1045 (1992). In this case, there is no question that the defendant was in the custody of law enforcement officials for *Miranda* purposes. The state also concedes, and the record reflects, that the officers did not advise the defendant of his *Miranda* rights. The sole issue is whether the defendant was subjected to interrogation at the time he made the statements.

"The term interrogation under *Miranda* refers both to express questioning and to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect. *State* v. *Vitale*, 197 Conn. 396, 411,

---

[8] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

497 A.2d 956 (1985), quoting *Rhode Island* v. *Innis*, 446 U.S. 291, [301], 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). A statement which is not elicited as a result of interrogation, but is given freely and voluntarily without any compelling influence, is admissible in evidence. *State* v. *Copeland*, supra, [205 Conn.] 207. It is the defendant's burden to show that he was interrogated. *State* v. *Doehrer*, supra, [200 Conn.] 647." (Internal quotation marks omitted.) *State* v. *Jackson*, supra, 28 Conn. App. 725.

The defendant claims that Fox's act of picking up the bag of crack cocaine in front of the defendant was coercive conduct designed to elicit an incriminating response. The defendant cites *State* v. *Krajger*, 182 Conn. 497, 438 A.2d 745 (1980), for this proposition, but the facts of *Krajger* are far different from those here.

In *Krajger*, our Supreme Court held that the action of a police officer constituted custodial interrogation for *Miranda* purposes when the officer held up a jacket in front of the defendant's cell and stated, "Bella, this is your jacket. You left it here last time you were here when you ran out of the building."[9] (Internal quotation marks omitted.) Id., 499 and n.2. The defendant responded, "Yes, that's my jacket." Id., 499. The court further stated that "[a]lthough the query was not posed in the form of a question, it clearly was interrogation in that the police conduct was reasonably likely to elicit an incriminating response." (Internal quotation marks omitted.) Id., 499 n.2.

Fox testified at the suppression hearing as follows: "I picked up the bag. There was—two of the smaller

---

[9] This questioning took place approximately five or ten minutes before the defendant was informed of his rights and interrogated. *State* v. *Krajger*, supra, 182 Conn. 499. The jacket had actually been found outside a murder victim's home. Id. During the subsequent interrogation, the defendant denied ownership of the jacket. Id., 499–500. During the trial, however, the state introduced the officer's testimony that the defendant had admitted ownership of the jacket. Id., 500.

bags were falling out of the bag. I picked them up and put them in. At that time I stated something to the effect [of], '[Racki], watch him.' I searched a little bit more in the garbage can. I swirled it around. There was no other plastic bags. There was no other what appeared to be narcotics in there, and at that time I placed [the defendant] under arrest." The defendant claims that this testimony supports his assertion.

Fox's conduct in picking up the bag from the garbage can in the presence of the defendant was not designed to elicit an incriminating response. To hold otherwise would unduly inhibit any law enforcement officer from retrieving the objects of his investigation in the presence of a suspect. There is nothing in the testimony that suggests that Fox, by his actions, was attempting to elicit any kind of response from the defendant. Because there was no interrogation, the defendant's statements were not subject to suppression pursuant to *Miranda*.

## II

The defendant next claims that the court improperly denied his motion to suppress the drugs seized by the police officer because the seizure violated the defendant's rights under the fourth amendment to the United States constitution and under article first, § 7, of the constitution of Connecticut. After examining the totality of the circumstances, the court, in its memorandum of decision denying the motion, found that "Fox had a reasonable and articulable suspicion that the defendant was engaging in or about to [engage] in criminal activity, namely possession or sale of illegal drugs. . . . Thus, Officer Fox's commands to halt were justified and his plain view of the defendant's disposal of the plastic bag into the garbage can in a public area justified its retrieving." We agree with the trial court.

"Under both the federal and state constitutions, police may detain an individual for investigative pur-

poses if there is a reasonable and articulable suspicion that the individual is engaged in or about to engage in criminal activity. *State* v. *Lamme*, 216 Conn. 172, 184, 579 A.2d 484 (1990). [T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that [stop]. *Terry* v. *Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable to show probable cause. *Alabama* v. *White*, [496 U.S. 325, 330, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990)]. *State* v. *Cofield*, 220 Conn. 38, 47–48, 595 A.2d 1349 (1991)." (Internal quotation marks omitted.) *State* v. *Groomes*, 232 Conn. 455, 467–68, 656 A.2d 646 (1995).

" 'A court reviewing the legality of a stop must therefore examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom.' *State* v. *Oquendo*, [223 Conn. 635, 654, 613 A.2d 1300 (1992)]. 'The determination of whether a reasonable and articulable suspicion exists involves a two-part analysis: (1) whether the underlying factual findings of the trial court are clearly erroneous; and (2) whether the conclusion that those facts gave rise to such a suspicion is legally correct.' *State* v. *Kyles*, 221 Conn. 643, 660, 607 A.2d 355 (1992)." *State* v. *Groomes*, supra, 232 Conn. 468. We conclude that the facts found by the trial court reasonably and adequately support its conclusion.

In denying the motion to suppress, the court found the facts that previously were recited.[10] The court also

---

[10] The facts found by the court are the same as those that the jury reasonably could have found from the evidence that was presented at trial.

found that the defendant never was interrogated by the police. The parties stipulated that the defendant resided at 19 Walnut Street and that the open garbage can was adjacent to the building in the driveway. Upon review, we conclude that the fact-finding by the trial court was supported by the evidence and was not clearly erroneous. We must now determine whether the court's conclusion that those facts gave rise to a reasonable and articulable suspicion was legally correct.

The facts support a reasonable and articulable suspicion that one or more of the members of the group of young men was engaged in criminal activity, namely, the possession of marijuana. Such suspicion reasonably can be based on the strong odor of marijuana coming from where the young men were standing. While the standard for reasonable suspicion is less demanding than that required to show probable cause; id.; other courts have concluded that *the odor of marijuana alone* can satisfy the more demanding probable cause requirement. See *State* v. *Longo*, 243 Conn. 732, 738–39 n.6, 708 A.2d 1354 (1998).[11]

Furthermore, the defendant's flight, coupled with the odor of marijuana, support the reasonable suspicion that the defendant might have been engaged in illegal activity. Although the defendant did not actually turn and run, he did immediately turn and walk away from the area where the odor of marijuana was detected by Fox. Flight from the police properly can be considered in determining whether a reasonable and articulable basis of suspicion exists where the defendant flees

[11] See *United States* v. *McSween*, 53 F.3d 684, 686 (5th Cir.), cert. denied, 516 U.S. 874, 116 S. Ct. 199, 133 L. Ed. 2d 133 (1995); *United States* v. *Nicholson*, 17 F.3d 1294, 1297 (10th Cir. 1994); *United States* v. *Reed*, 882 F.2d 147, 149 (5th Cir. 1989); *United States* v. *Haley*, 669 F.2d 201, 203 (4th Cir.), cert. denied, 457 U.S. 1117, 102 S. Ct. 2928, 73 L. Ed. 2d 1329 (1982); *United States* v. *Garcia-Rodriguez*, 558 F.2d 956, 964 (9th Cir. 1977), cert. denied, 434 U.S. 1050, 98 S. Ct. 900, 54 L. Ed. 2d 802 (1978).

before the police attempt to stop him. See *Illinois* v. *Wardlow*, 528 U.S. 119, 120 S. Ct. 673, 676, 145 L. Ed. 2d 570 (2000); *State* v. *Groomes*, supra, 232 Conn. 471–72; *State* v. *Rodriguez*, 14 Conn. App. 574, 578, 542 A.2d 342 (1988). We conclude that the defendant's actions, along with the odor of marijuana, provided the police with a reasonable and articulable suspicion that a crime was being committed, thereby justifying the investigative stop.

The defendant also claims that the search of the garbage can on his property was not proper because it does not come within any of the recognized exceptions to the search warrant requirement. "It is a basic principle of constitutional law that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' . . . *Katz* v. *United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); see *Coolidge* v. *New Hampshire*, 403 U.S. 443, 455–56, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971)." (Emphasis in original.) *State* v. *Januszewski*, 182 Conn. 142, 151–52, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981). One such exception is the plain view doctrine.

"In *Coolidge* v. *New Hampshire*, supra, [403 U.S. 443], the United States Supreme Court held that in certain circumstances a warrantless seizure by police of an item that comes within plain view during their lawful search of a private area may be reasonable under the fourth amendment. . . . The plain view exception to the warrant requirement is based upon the premise that the police need not ignore incriminating evidence in plain view while they are . . . entitled to be in a position to view the items seized. . . . Three requirements must be met to invoke the plain view doctrine: First, the items seized must be in the plain view of the police,

second the initial intrusion that enabled the police to view the items seized must have been lawful; and [third] the police must have had probable cause to believe that these items were contraband or stolen goods." (Citations omitted; internal quotation marks omitted.) *State* v. *Holmes*, 51 Conn. App. 217, 220–21, 721 A.2d 1195 (1998), cert. denied, 248 Conn. 904, 731 A.2d 309 (1999).

First, we note that the bag of crack cocaine was discarded into an open garbage can in the plain view of Fox. The area outside the defendant's home exposed to public view is a public space and is not subject to fourth amendment protection. See *State* v. *Santiago*, 224 Conn. 494, 500, 619 A.2d 1132 (1993). The defendant makes much of the fact that Fox testified that he was not able to identify drugs in the hand of the defendant, but rather, he could only state that the defendant was holding a plastic bag in his right hand. This argument is unavailing. Fox saw the defendant place his right hand into the open garbage can. Fox then immediately observed in the garbage can a plastic bag containing what later was determined to be cocaine. Second, Fox was lawfully on the property on the basis of his reasonable and articulable suspicion that an illegal activity was occurring, as previously discussed.

Finally, Fox had probable cause to believe that the bag the defendant carried and placed in the garbage can contained drugs on the basis of the odor of burning marijuana that Fox smelled when he first observed the defendant, as well as on the basis of the defendant's evasive action in retreating to his property. The court properly denied the defendant's motion to suppress.

### III

The defendant next claims that the court improperly overruled his objection to the map offered into evidence by the state to establish that the defendant possessed

a narcotic substance with the intent to sell within 1500 feet of a school in violation of § 21a-278a (b). We disagree.

The state must prove that the defendant intended to sell the drugs in his possession in a location that is within 1500 feet of a school. See *State* v. *Knight,* 56 Conn. App. 845, 850, 747 A.2d 13 (2000). To meet its burden, the state sought to introduce into evidence a computer generated engineering map showing that 19 Walnut Street was 1125 feet from St. Mary's Elementary School. To authenticate the map, the state offered the testimony of Stephen Santovasi, a geographic information system technician who was employed by the city of Waterbury.

The defendant argues that the map clearly was introduced for the truth of the matter asserted therein, that is, that 19 Walnut Street was within 1500 feet of a school. Consequently, the defendant argues that the map should have been excluded as hearsay.

"The appropriate standard of review in cases concerning the admissibility of evidence is limited to whether the trial court abused its discretion. . . . It is generally accepted that a trial court has broad discretion in ruling on the admissibility of evidence and appellate courts will ordinarily not disturb a trial court's ruling on admissibility of evidence unless a clear abuse of discretion is shown. . . . Every reasonable presumption should be given in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. Reversal is required only when an injustice appears to have occurred." (Citations omitted; internal quotation marks omitted.) *State* v. *Kirker,* 47 Conn. App. 612, 615–16, 707 A.2d 303, cert. denied, 244 Conn. 914, 713 A.2d 831 (1998).

"Our Supreme Court has called a map no more than the pictorial representation of the testimony of the wit-

ness through whom it was offered into evidence. . . . Any inaccuracies of the exhibit do not raise a question of admissibility, but rather a question of what weight the jury will afford it. . . . The admissibility of a map is similar to the admissibility of a photograph in that the trial court should examine whether the exhibit aids the jury in understanding the evidence. . . . The trial court in ruling on admissibility is concerned with whether the map is relevant and whether it will assist the jury in understanding the testimony." (Citations omitted; internal quotation marks omitted.) Id., 616.

Through his testimony, Santovasi indicated that he went to the actual locations depicted on the map to determine the actual locations and then entered the data into the computer that generated the map. He further testified that the program utilized to generate the map included formulas created by others to generate the distance between the school and the location where the defendant was arrested. He also testified that the coordination method that is the basis for the entire system was checked by the state of Connecticut and private engineering companies. He pointed out that the coordination system was not, in fact, displayed on the map entered into evidence, but the result was checked against the coordination system. Finally, he testified that the map was a fair and accurate representation of the distance from St. Mary's school to 19 Walnut Street.

The defendant makes much of the fact that Santovasi did not actually calculate the distance between the school and 19 Walnut Street with a tape measure and that he assumed that the mathematical formulas correctly calculated the distance. Use of a tape measure is not required. The court determined that the map would aid the jury in its determination of whether the defendant committed the offense within 1500 feet of a school. Inaccuracies, if any, go to the question of what weight the jury might assign to the map, not to the

map's admissibility. The court properly admitted the map into evidence.

## IV

The defendant next claims that the court improperly denied his motion for a judgment of acquittal. The defendant's primary argument is that the evidence was insufficient because the jury could only speculate as to who placed the drugs in the garbage can. The defendant points to Fox's testimony that he did not see drugs in the defendant's hand, but rather, only a plastic bag. Fox also testified that there were several other persons near the garbage can around the time that the defendant was arrested. The defendant argues that any one of them could have thrown the drugs into the garbage can prior to the defendant's alleged actions.

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . *State* v. *Delgado*, 247 Conn. 616, 620–21, 725 A.2d 306 (1999)." (Citations omitted; internal quotation marks omitted.) *State* v. *DeCaro*, 252 Conn. 229, 239, 745 A.2d 800 (2000).

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of inno-

cence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . *State* v. *Delgado*, supra, 247 Conn. 621." (Internal quotation marks omitted.) *State* v. *DeCaro*, supra, 252 Conn. 240.

We are not persuaded by the defendant's argument. The jury was not asked to speculate, but was called on to draw a reasonable inference from the evidence introduced at trial. In our view, the jury reasonably concluded that the bag observed in the defendant's hand immediately before he dipped his hand into the garbage can was the same bag that was retrieved by Fox.

V

The defendant's final claim is that the court improperly denied his motion in limine seeking to preclude the introduction of his prior felony convictions, should he testify. The defendant relies on Practice Book § 741 (3),[12] now § 40-11, which, at the time that the request was made, required the state to provide "promptly, but no later than forty five days from the filing of the request . . . [c]opies of the defendant's prior criminal record

[12] Practice Book § 741, now § 40-11, provides in relevant part: "Upon written request by a defendant filed in accordance with Sec. 811 [now § 41-5] and without requiring any order of the judicial authority the prosecuting authority, subject to Sec. 785 et seq. [now § 40-40 et seq.], shall promptly, but no later than forty five days from the filing of the request, unless such time is extended by the judicial authority for good cause shown, disclose in writing the existence of and allow the defendant in accordance with Sec. 737A [now § 40-7], to inspect, copy, photograph and have reasonable tests made on any of the following items . . .

"(3) Copies of the defendant's prior criminal record, if any, which are within the possession, custody, or control of the prosecuting authority, the existence of which is known, or by the exercise of due diligence may become known, to the prosecuting authority . . . ."

. . . ." The defendant asserts that because his discovery request was eighteen months old and the trial was already underway when the state proffered the defendant's criminal history, he was harmed to the extent that he did not know whether he should testify until the middle of his trial. We disagree.

On August 8, 1996, the defendant filed a discovery motion seeking the disclosure by the state of "complete details concerning any prior crime or alleged 'bad act' of the defendant which the state intends to use either in rebuttal or in its case-in-chief at trial, either to impeach the defendant's credibility as a witness or to identify the defendant as the perpetrator of the crime here at issue . . . ." On February 10, 1998, the date that the evidentiary portion of the trial commenced, the state disclosed that the defendant had a felony record in North Carolina for possession of cocaine.

The defendant, on February 11, 1998, made an oral motion in limine to preclude the state from using the information at trial. At the hearing on his oral motion, the defendant argued that the disclosure of this information at such a late date was inherently prejudicial. The state explained that it initially complied with the discovery request and provided a lengthy record of the defendant's criminal activities in Connecticut, New Jersey and North Carolina. The defendant suggested that the record provided by the state was not correct. Because the defendant's name is rather common, the state investigated each of the offenses listed to discern if any might be incorrect. The court denied the motion in limine.[13]

---

[13] The court in its oral decision stated: "The timeliness argument is not supported by the facts here. The state, I think, has acted as well as it could to provide this information, and provided it on the basis of the defense request. As was indicated on the record before the trial started, that there was—we were still looking into all these things because of the complications that come with record transfers on an interstate basis. I'm not going to disallow this on the basis of timeliness."

"Generally, '[t]rial courts have wide discretion with regard to evidentiary issues and their rulings will be reversed only if there has been an abuse of discretion or a manifest injustice appears to have occurred. *State* v. *Robinson*, 227 Conn. 711, 732, 631 A.2d 288 (1993). Every reasonable presumption will be made in favor of upholding the trial court's ruling, and it will be overturned only for a manifest abuse of discretion. *State* v. *Kulmac*, 230 Conn. 43, 61, 644 A.2d 887 (1994).' *State* v. *Gracia*, 51 Conn. App. 4, 15–16, 719 A.2d 1196 (1998)." *Olson* v. *Accessory Controls & Equipment Corp.*, 54 Conn. App. 506, 526, 735 A.2d 881, cert. granted on other grounds, 251 Conn. 917, 740 A.2d 864 (1999).

The defendant urges us to view the forty-five day requirement as if it were a per se rule, the violation of which would require the trial court to rule against the state. The defendant fails to recognize the importance of the language in the rule that provides for judicial discretion to extend the time requirement for good cause shown. Furthermore, the defendant cites no case law to support his proposition. The record shows that the state proffered an explanation for the delay, which the court accepted as reasonable. We conclude that the court did not abuse its discretion.

The judgment is affirmed.

In this opinion the other judges concurred.